UNITED STATES of America,

v.

Maxwell Edward CHRISMAN,
Defendant.

No. EP–02–CR–245.

United States District Court,
W.D. Texas,
El Paso Division.

June 28, 2002.

Stanley M. Serwatka, Assistant U.S. Attorney, El Paso, TX, for the Government.

Margaret Ann Katze, Assistant Federal Public Defender, El Paso, TX, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND MOTION TO SUPPRESS STATEMENTS

FURGESON, District Judge.

After Defendant Maxwell Edward Chrisman's flight from the scene of a roving patrol stop and subsequent apprehension, United States Border Patrol agents discovered 565.16 pounds of marijuana in his vehicle. Defendant was charged with possession with the intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vii).

Before the Court are Defendant's Motion to Suppress and Motion to Suppress Statements, filed on March 22, 2002, in the above-captioned matter. After careful consideration, the Court is of the opinion that the Border Patrol agents had reasonable suspicion to pull over Defendant and

acted in compliance with the Fourth Amendment. Further, the Court concludes that the Drug Enforcement Agency ("DEA") agents, in whose custody Defendant made an incriminating statement, did not violate his Fifth Amendment rights. Accordingly, the Motions should be DENIED.

## BACKGROUND

Early in the morning of January 20, 2002, Border Patrol Agents Rafael Ramirez and Elizabeth Hettenhouser were inspecting a levy road approximately ten miles west of the Fort Hancock Port of Entry. Around 12:15 a.m., the Agents received a signal that a seismic sensor, placed along the Rio Grande, which serves as the U.S.-Mexico border in Texas, had been activated.

The sensor is positioned approximately seventeen miles east of the Fort Hancock Port of Entry and two miles south of I–10. The only way to access the terrain around the sensor, from north of the border, is on the old Wander Ranch Road ("the Road"). The Road is winding, unpaved, and full of washouts. Driving its length at night, without four-wheel drive, could take over twenty minutes because of its poor condition.

The area surrounding the Road is isolated and uninhabited. There are no homes or businesses near the sensors, and the closest establishments to the Road are a motel, approximately five miles to the east, and a truck stop, approximately five miles to the west.

The Agents proceeded directly toward the area of the sensor upon receiving its signal. An estimated twenty-five minutes elapsed between the time of the sensor alert and the time of the Agents' arrival at the point where the Road intersects Interstate 10 ("I–10"). While en route, they received an alert from a second seismic sensor that is located to the north of the first sensor. This sequence of sensor hits indicated that the pedestrian traffic was northbound.

Upon arriving in the area, the Agents began to position themselves immediately north of the point where the Road and I–10 meet. At this time, they received a signal from a magnetic sensor, located along the Road, that indicated the presence of a vehicle traveling south towards the Rio Grande.

The seismic sensor hits along the river combined with the magnetic sensor hit indicating a southbound vehicle roused the Agents' suspicions. Such a pattern often connotes illegal immigration or drug smuggling into the United States. In this scenario, the southbound vehicle meets the illegal immigrants or drug smugglers after they cross the Rio Grande and transports the immigrants or narcotics away from the border.

Simultaneous to the magnetic sensor activity, the Agents saw a light, glowing south of I–10, that appeared to be coming from a vehicle's headlights. The Agents believed that if they drove south to investigate the source of the light, anyone in the area would have fled to Mexico. Because the Road is the only way to access the area of the sensor activity, they knew that the southbound vehicle would have to return towards their position north of I–10. Content to wait, the Agents scanned the area south of the interstate with their binoculars.[1]

The Agents observed the glow for approximately one hour before they received a magnetic sensor indication that the vehicle was northbound and saw its headlights approaching them. The vehicle traversed the eastbound lanes of I–10—perpendicu-

---

1. The Agents did not have night-vision equip- ment.

lar to the east-west flow of traffic—drove over the median, and proceeded west-bound. As the vehicle turned onto I–10, the Agents were able to observe that it was a van with a discolored right, rear door. Although familiar with most vehicles in the area, Agent Ramirez had never seen the van before the morning in question.

The Agents did not want to stop the van immediately upon seeing it because of construction on I–10 that narrowed the interstate to one westbound lane. Instead, they followed it for approximately fifty miles, through several construction zones, and finally pulled it over near mile marker forty-seven.

Agent Ramirez exited his vehicle and approached the van. When he reached the rear of the van, Defendant sped away, crossing the westbound lanes, median, and eastbound lanes of the interstate. Defendant drove into an arroyo to the south of I–10, where the van became immobilized in the sand. He fled from the vehicle and, after a short chase, was apprehended and handcuffed by Agent Ramirez. Inside the van, Agents found 565.16 pounds of marijuana.

Border Patrol Agent Daniel Govea, who had arrived at the scene, read Defendant his *Miranda* rights, and Defendant invoked his right to remain silent. The Agents transported Defendant to the Fort Hancock Port of Entry where, several hours later, DEA Special Agents Jaime Ordonez and Michael Stevens took custody of him. Agent Ordonez advised Defendant of his *Miranda* rights a second time, and once again, Defendant invoked his rights and refused to give a statement.

Agents Ordonez and Stevens transported Defendant in their pickup truck from Fort Hancock to El Paso. Defendant sat, handcuffed and silent, between the two Agents while they conversed about the National Football League playoffs. At one point, Agent Stevens told Defendant he should smuggle dope during the week, instead of on weekends, because the Agents do not get paid to work on Sundays and having to work interrupts their football viewing. Defendant responded that, indeed, he does smuggle drugs on weekdays but had never been caught. The Agents did not say anything else to Defendant during the ride.

Defendant filed the instant Motions on March 22, 2002, and the Government replied on April 2, 2002. The Court held a hearing on the Motions on May 28, 2002.

## DISCUSSION

Defendant alleges that (1) the Border Patrol Agents stopped his vehicle without reasonable suspicion, in violation of the Fourth Amendment, and (2) the DEA Agents interrogated him after he had invoked his rights to counsel and to remain silent, in violation of the Fifth Amendment. The Court discusses the issues separately below.

### I. The Stop

Defendant contends that Border Patrol Agents Ramirez and Hettenhouser based their decision to stop him solely on a hunch that Defendant's vehicle had triggered the sensors on the Road. Defendant argues that because "there were no other objective, articulable facts on which to base a reasonable suspicion," the seizure and subsequent search of the van violated his constitutional rights.

 The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of a vehicle.[2] An investigatory stop must be justified by an objective manifestation that

---

**2.** *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

the person stopped is, or is about to be, engaged in criminal activity.[3]

■ An agent has reasonable suspicion if, based on the totality of the circumstances, he has a particularized and objective basis for suspecting criminal wrongdoing.[4] The totality of the circumstances test allows officers to draw upon their experience and specialized training to make inferences from and deductions about the information available to them.[5] Although an officer's reliance on a mere hunch does not amount to reasonable suspicion, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." [6]

■ Factors to be considered in determining whether actions of a law enforcement official were justified by reasonable suspicion include: (1) characteristics of the area in which the agent encounters the vehicle; (2) proximity to the border; (3) usual patterns of traffic on that particular road; (4) previous experience of the arresting officers; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6) driver's behavior, such as erratic driving or obvious attempts to evade officers; (7) appearance of the vehicle; and (8) passengers' number, appearance, and behavior.[7] This list is not

exhaustive and no single factor is determinative.[8] Furthermore, factors that when considered independently are consistent with innocent behavior may collectively amount to reasonable suspicion.[9]

After considering the relevant factors, the Court concludes that the Agents had the requisite reasonable suspicion to perform a roving patrol stop of Defendant's vehicle.

### a. Proximity to the Border

The Road, where Defendant was first detected, is an approximately two-mile stretch going from I–10 to the Rio Grande. The proximity to the border and the availability of unmanned entry points in the area support the Agents' reasonable suspicion determination.[10]

### b. Sensor Activity

Agents Ramirez and Hettenhouser relied heavily on information relayed to them from various sensors in forming their suspicion that Defendant was involved in criminal wrongdoing. The centrality of sensors to this roving patrol stop warrants a brief discussion of their use by the Border Patrol.

The Border Patrol has been using sensors for approximately three decades to help detect illegal border crossings and alien and drug smuggling in areas where it

---

3. *Id.*

4. *United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002).

5. *Id.*

6. *Id.* at 750–51 (citation omitted).

7. *United States v. Brignoni–Ponce,* 422 U.S. 873, 884–85, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Ceniceros,* 204 F.3d 581, 584 (5th Cir.2000).

8. *See Brignoni–Ponce,* 422 U.S. at 884–85, 95 S.Ct. 2574; *Cortez,* 449 U.S. at 417–18, 101

S.Ct. 690; *United States v. Gonzalez,* 190 F.3d 668, 672 (5th Cir.1999).

9. *Arvizu,* 122 S.Ct. at 751 (citing *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).

10. *United States v. Jacquinot,* 258 F.3d 423, 428 (5th Cir.2001) (noting that a vital element in the reasonable suspicion determination is whether agents reasonably believed that the vehicle crossed the border or originated its journey at the border); *United States v. Nichols,* 142 F.3d 857, 865 (5th Cir.1998).

is impossible or impractical for agents to maintain a constant presence.[11] It now has an estimated 13,000 seismic, magnetic, and infrared sensors located at various points along and in proximity to the United States's borders with Canada and Mexico.[12] These sensors can detect movement and heat sources within a fifty-foot radius and can detect metal within 250 feet.[13]

Seismic sensors generally are used to detect pedestrian traffic, but a signal from a seismic sensor does not specify whether a human being, animal, or vehicle activated it. An agent cannot discern the direction of the pedestrian traffic when only one seismic sensor has been activated; however, if more than one is triggered an agent can infer that the source of the trigger is moving in a direction that corresponds to the locations of the activated sensors.

Magnetic sensors, as their name indicates, are triggered by large amounts of metal, such as a car or truck. Magnetic sensors are equipped to indicate the direction in which a vehicle is traveling.

A sensor alert, alone, does not create reasonable suspicion for an immigration stop.[14] However, as the instant case demonstrates, a sensor hit combined with other factors can give rise to reasonable suspicion sufficient to justify a brief, investigatory stop.[15]

The seismic and magnetic sensor alerts were pivotal to the Agents' reasonable suspicion analysis. The pattern of seismic sensor "hits" along the Rio Grande indicated that someone or something was moving north from the border. Because the sensors are located so close to the Rio Grande, the Agents believed that a sensor alert, early in the morning in a remote area, could signify that somebody had crossed the border illegally. The ensuing magnetic alert, indicating the presence of a

---

**11.** L. Scott Tillett, *Cameras, GPS Integrated to Fight Illegal Immigration*, FEDERAL COMPUTER WEEK, Oct. 20, 1997, *at* http://www.fcw.com/fcw/articles/1997/FCW_102097_1141.asp.

**12.** Shruti Date, *Immigration Service Patrols With Sensors and Videos*, GOVERNMENT COMPUTER NEWS, Feb. 7, 2000, *at* http://www.gcn.com/vol19_no3/news/1278–1.html.

**13.** *Id.*

**14.** *United States v. Inocencio*, 40 F.3d 716, 723 (5th Cir.1994); *United States v. Frisbie*, 550 F.2d 335, 338 (5th Cir.1977); *United States v. Shields*, 534 F.2d 605, 608 (5th Cir. 1976); *but cf. United States v. Laird*, 511 F.2d 1039 (9th Cir.1975) (holding that a signal from a sensor while the defendant's vehicle was near the border by itself could "give rise to founded suspicion sufficient for a stop.").

**15.** *Inocencio*, 40 F.3d at 723 (holding that a sensor hit together with an unfamiliar vehicle and an unfamiliar driver on a private ranch road justified the investigatory stop); *United States v. Espinoza–Seanez*, 862 F.2d 526, 531–

32 (5th Cir.1988) (reiterating that a sensor alert near an isolated area on the border combined with other factors constituted reasonable suspicion); *United States v. Gordon*, 712 F.2d 110, 112–13 (5th Cir.1983) (concluding an investigatory stop of a truck was justified in light of a sensor alert on Highway 385, an unfamiliar vehicle traveling at an unusual time, and the presence of a hidden compartment in the bed of the truck); *United States v. Aguirre–Valenzuela*, 700 F.2d 161, 163 (5th Cir.1983) (holding that sensor alerts on roads in close proximity to the border and away from any controlled checkpoints, several passengers, and erratic driving gave rise to reasonable suspicion); *United States v. Rodriguez–Martinez*, 626 F.2d 1232, 1234 (5th Cir. Unit A 1980) (stating that agents had reasonable suspicion in light of terrain, availability of unmanned entry points, high incidence of alien arrests in the area, and the presence of a non-local vehicle); *United States v. Almand*, 565 F.2d 927, 929 (5th Cir.1978) (holding that sensor signals revealing direction of vehicle and sparse amount of traffic on highway, knowledge that vehicle that had triggered sensors had stopped or turned off highway, and warm grill of vehicle stopped on the side of the road constituted reasonable suspicion).

southbound vehicle on the Road, led the agents to suspect that the vehicle was going to meet whomever had crossed the river and activated the seismic sensors. As mentioned above, this pattern of sensor activity is often consistent with the smuggling of immigrants or narcotics across the U.S.-Mexico border.

Contrary to Defendant's argument, Agents Ramirez and Hettenhouser were operating on significantly more than a mere "hunch" that Defendant's vehicle was the one that triggered the magnetic sensors. Agent Ramirez testified that the sensor alert to a southbound vehicle on the Road occurred simultaneous to the Agents' positioning themselves to monitor the Road. In light of the fact that the Road is the only way to access this remote area and the absence of any evidence indicating the presence of another vehicle, the Agents had ample reason to conclude that Defendant's vehicle triggered the sensor.

### c. Characteristics of the Area Around the Road

The Road is in poor condition,[16] and the area surrounding it is isolated, uninhabited, and devoid of farms, ranches, businesses, and fishing lakes. The secluded nature of the area, the poor condition of the road, and the fact that Defendant was driving there in the early morning hours all contribute to the existence of reasonable suspicion.[17]

### d. Usual Patterns of Traffic on the Road

Agent Ramirez testified that usually there is no traffic on the Road and that the magnetic sensor alert and glow of head-lights after midnight made the Agents suspicious. This factor weighs in favor of the existence of reasonable suspicion.

### e. Information About Recent Illegal Trafficking in Aliens or Narcotics

Agent Ramirez further testified that the seismic sensors had been activated several months prior to the night Defendant was apprehended. On that occasion, people were guiding horses laden with marijuana north from the river. While this information is certainly relevant and bolsters the reasonable suspicion analysis, the Court notes that Agent Ramirez testified only to one prior instance of drug trafficking and that instance did not immediately precede the night of Defendant's apprehension.

### f. Driver's Erratic Behavior

The Agents saw Defendant cross the eastbound lanes and median of I-10, perpendicular to the normal flow of traffic, before turning west on the interstate. When considered in the totality of circumstances, this illegal maneuver supports the reasonable suspicion determination.

### g. Previous Experience of Arresting Agents

Both Agents Ramirez and Hettenhouser have been stationed at the Fort Hancock Port of Entry for their entire Border Patrol careers. Although Agent Hettenhouser has worked for the agency for only one year, Agent Ramirez is a seven-year veteran and is familiar with the area surrounding the Road. He also testified to a familiarity with the vehicles commonly present in the Fort Hancock area and noted that he had not seen Defendant's van during

---

**16.** *United States v. Rodriguez–Martinez,* 626 F.2d at 1234 (considering the rough terrain of the road on which the vehicle alerted the sensors as a factor in the reasonable suspicion analysis).

**17.** *United States v. Samaguey,* 180 F.3d 195, 198 (5th Cir.1999) (explaining that "traveling at an unusual time of day alone may not give rise to a reasonable suspicion," but may be considered in the overall analysis) (citing *United States v. Villalobos,* 161 F.3d 285, 289 (5th Cir.1998)).

his tenure in that locale. The Court considers all of the above factors in light of Agent Ramirez's significant experience with the Border Patrol and in the Fort Hancock area.

■ In sum, a variety of relevant factors gave rise to reasonable suspicion of Defendant's involvement in criminal activity. An experienced agent interpreted sensor alerts, along the Rio Grande and on a road in close proximity to the border, as possible signs of illegal immigrant or narcotics smuggling. The early morning hour, the remote nature of the area, the normal absence of traffic on the Road, the unfamiliar vehicle, the illegal driving maneuver, and the prior correlation between sensor alerts and narcotics smuggling all contributed to the reasonable suspicion analysis. Based on the totality of circumstances, the Agents were justified in stopping Defendant and did not violate his Fourth Amendment rights.

## II. The Incriminating Statement

Defendant next argues that he was interrogated, during the trip from Fort Hancock to El Paso, after he had invoked his *Miranda* rights and in violation of the Fifth Amendment. Defendant asserts that Agent Stevens knew the suggestion that Defendant smuggle narcotics only on weekdays was likely to elicit an incriminating response. The Court disagrees.

■ The *Miranda* decision dictates that statements made by a defendant during a "custodial interrogation" are inadmissible unless certain procedural safeguards are respected.[18] The purpose of requiring *Miranda* warnings is (1) to protect captive suspects by ensuring that police do not coerce or trick a suspect to confess against his will, and (2) to lessen the burden on the courts of determining, after the fact, whether particular confessions were voluntary.[19]

■ An individual is in custody, for purposes of the Fifth Amendment, when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[20] Here, Defendant clearly was in custody during the trip to El Paso and had invoked his *Miranda* rights. Thus, Defendant was entitled to remain silent and free from interrogation until he had consulted with a lawyer.[21]

■ The sole issue, then, is whether Agent Stevens's comment to Defendant constituted "interrogation," in violation of *Miranda* and the Fifth Amendment. The Supreme Court has held that "interrogation," for Fifth Amendment purposes, refers not only to express questioning but also to its functional equivalent, which includes any "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect."[22] In determining whether a police practice constitutes interrogation, the primary focus is on the perceptions of the suspect rather than the intent of the police.[23]

---

**18.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Harrell,* 894 F.2d 120, 123 (5th Cir.1990).

**19.** *Berkemer v. McCarty,* 468 U.S. 420, 433, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

**20.** *Stansbury v. California,* 511 U.S. 318, 322–23, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (citing *California v. Beheler* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)) (internal quotations omitted).

**21.** *Rhode Island v. Innis,* 446 U.S. 291, 298, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

**22.** *Id.* at 300–01, 100 S.Ct. 1682.

**23.** *Id.; but see id.* at n. 7 (stating that the intent of the police is relevant in determining whether interrogation occurred in that it may bear on whether the police should have known theirs words or actions were reasonably likely to elicit an incriminating response).

However, the Court cautioned that police are not to be held accountable "for the unforeseeable results of their words or actions;" accordingly, the definition of interrogation extends only to words or actions that an officer *"should have known* were reasonably likely to elicit an incriminating response." [24]

▮ Agent Stevens's comment was not an express question and, after considering the issue from Defendant's perspective, the Court concludes that it did not constitute the functional equivalent of questioning. Although Defendant may have been fatigued from his arrest and detention at Fort Hancock,[25] nothing in the record indicates that he was unusually disoriented upset, or susceptible to a sarcastic comment. Likewise, even though Defendant could have interpreted the comment as a slight taunt, it was not emotionally charged in a manner likely to upset or severely offend him. Further, Agent Stevens testified that he did not expect Defendant to respond, and there is no evidence suggesting that the Agent insinuated a response was required.[26] Finally, the Court notes that Agent Stevens was present when Defendant received his *Miranda* rights and invoked his right to silence. Because Defendant had received the warnings and expressly opted not to speak with the Agents less than one hour prior to the time of Agent Stevens's comment, it would have been difficult to anticipate that the comment would elicit an incriminating response.[27]

Although not the primary focus, Agent Stevens's lack of intent to evoke an incriminating response also weighs against suppressing Defendant's statement. The Court is convinced that his comment was "off-the-cuff" and that neither the comment nor the Agents' dialogue were attempts to bait, persuade, or trick Defendant into self-incrimination. After all, conversations about the NFL playoffs permeate Sundays in January, and Defendant's arrest occurred a mere two weeks before the Super Bowl.[28] While football discourse can be quite passionate, it hardly seems as though the conversation was contrived to elicit an incriminating statement. In light of the above discussion, Defendant's Motion to Suppress Statements should be denied.

## CONCLUSION

The Court holds that 1) Border Patrol Agents Ramirez and Hettenhouser did not violate the Fourth Amendment by stopping Defendant's vehicle on I–10, and 2) Agent Stevens's comment did not amount to a custodial interrogation in violation of *Miranda* and the Fifth Amendment. Accordingly, Defendant's Motion to Suppress and Motion to Suppress Statements should be denied.

It is therefore ORDERED that Defendant's Motion to Suppress is DENIED.

24. *Id.*

25. Although the record does not clarify the specific time, it appears that Defendant was apprehended by Border Patrol Agent Ramirez between two and three a.m. on January 20, 2002. He was transported from the Fort Hancock Border Patrol Station to El Paso between ten and eleven a.m. on the same day.

26. *United States v. Bennett,* 626 F.2d 1309, 1313 (5th Cir. Unit B 1980) (explaining that an officer could not have reasonably anticipated the defendant's response since nothing indicated that the officer wanted, expected, or demanded the defendant to respond).

27. *Id.* at n. 9 (stating that an officer can anticipate that a suspect who has been given *Miranda* warnings will be "more reticent in the face of police remarks.").

28. Super Bowl XXXVI took place on Sunday, February 3, 2002.

It is further ORDERED that Defendant's Motion to Suppress Statements is DENIED.